01

02

03

04

05

06                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
07                            AT SEATTLE

08  ANTHONY WALLER,                    )    CASE NO. C05-1904-MJP
                                       )
09          Petitioner,                )
                                       )
10  v.                                 )    REPORT AND RECOMMENDATION
                                       )
11  KENNETH QUINN,                     )
                                       )
12          Respondent.                )
    _____ )

13

14                              INTRODUCTION

15          Petitioner Anthony Waller is a Washington state prisoner who is currently serving a 432-

16  month sentence for first degree murder.  He has filed a *pro se* petition for a writ of habeas corpus

17  pursuant to 28 U.S.C. § 2254, to which respondent has filed an answer.  After considering the

18  parties' briefs and the balance of the record, the court recommends that the petition be denied with

19  prejudice.

20                              BACKGROUND

21          The Washington Court of Appeals summarized the facts in petitioner's case as follows:

22          On the evening of January 17, 1999, in Auburn, Washington, at about 10:30

REPORT AND RECOMMENDATION
PAGE -1

p.m., the defendant Anthony Waller and three other young men, Michael Waller, Adam Okerson and Nick Kemper, left Michael's house in Kemper's Ford Bronco. After buying some beer, the four young men stopped in an industrial area near some warehouses. Anthony got out of the truck and, with a screwdriver, began breaking into vehicles and stealing things.

As the group was getting ready to leave, they spotted a man walking through the area some distance away. Anthony jumped out of the Bronco and started to chase the man. According to Okerson, Anthony said that he was worried about the guy getting the license plate number of the Bronco, and claimed that "he was going to go beat this guy's ass." Okerson observed Anthony hit the man in the back of the head with his fist and observed the man struggle to get away. Michael and Okerson then followed Anthony. They found him some distance away, kneeling over the man he had been chasing, and apparently punching him. The man was lying on his back and his face was covered with blood. Okerson and Michael called Anthony, who rose to return with them to the Bronco. At this point, Anthony said something like, "This is what happens . . . when people fuck with me or see shit they're not supposed to." Okerson saw that Anthony had a screwdriver in his hand.

When the three men returned to the Bronco, Kemper drove away from the scene. As the Bronco turned to enter Highway 167, Anthony threw the screwdriver out of the window.

The group returned to Michael's house. As they were entering the house, Anthony warned Michael and Okerson not to say anything about the assault to anyone. Anthony entered the house to wash his hands, and then left with Kemper.

Some hours later, a passerby discovered the victim's body. Police officers identified the man as Thomas Moore, a homeless man who lived in a camp nearby. The victim suffered more than 40 stab wounds to the head, and through-and-through stab wounds to the left hand. The wounds to the hand were defensive, indicating that Moore initially attempted to ward off the blows. The majority of the wounds were localized around the eyes. The wounds were all consistent with being inflicted with a flathead screwdriver.

In late February 1999, the police investigation ultimately led police to numerous witnesses, including Okerson, Kemper and Michael Waller. With the assistance of the witnesses, police located the screwdriver that Anthony had thrown from the window of the Bronco, near an on-ramp of Highway 167. Blood was present on the screwdriver. DNA tests revealed that the genetic profile of the blood was the same as the victim's.

Police removed small chips of freshly broken glass from the victim's overalls.

REPORT AND RECOMMENDATION
PAGE -2

01   Police also recovered glass fragments from the passenger side floor mat where
     Anthony Waller was sitting in the Bronco after the car prowls. Two of the glass
02   samples from the floor mat had the same refractive index as samples recovered from
     the overalls. Anthony Waller had left town in late January, telling his fiancee that he
03   had to leave because he had murdered somebody. Waller eventually surrendered to
     police in Honolulu, Hawaii on March 19, 1999.

04

05   Detectives Steven Kelly and Kathy Holt of the Kent Police Department flew
     to Hawaii and met with Waller on March 20, at around midnight. They advised
     Waller of his rights, and he indicated that he wanted to speak with the detectives, but
06   wished to talk with his father first. The detectives returned the following day.
     Because Waller had not yet spoken to his father, the detectives allowed him to make
07   that telephone call. After the call, Waller indicated that he was willing to talk with the
     detectives. The detectives again advised Waller of his rights, which he waived.
08   Waller initially told the detectives, in a taped statement, that Michael Waller and
     Adam Okerson had attacked the victim, and that he had not participated in the attack.
09   The detectives confronted Waller with the evidence they had so far obtained, and told
     him that they did not believe his story. Waller then started to cry and admitted to the
10   killing. The detectives took a second tape-recorded statement from Waller, after again
     advising him of his rights and obtaining a waiver. Waller admitted that he was the
11   sole attacker, but claimed that he was "really drunk" that night and had not meant to
     kill the man.

12

13   Waller was charged with premeditated murder in the first degree. Before trial,
     Waller filed a CrR 3.5 motion to suppress the statements that he had made to police.
     After a hearing, the trial court ruled that the statements were admissible.

14

15   On December 23, 1999, a jury found Waller guilty as charged. Waller's
     standard sentence range was 271 to 361 months. The trial court imposed an
16   exceptional sentence of 432 months, finding that deliberate cruelty to the victim was
     an aggravating circumstance. The court also imposed a community placement
     sentence

17

18   *State of Washington v. Waller*, Unpublished opinion, 2001 WL 919349 (Wash. App. 2001) (Dkt.

19   #18, Ex. 4 at 2-5).

20   Petitioner appealed to the Washington Court of Appeals. The court affirmed petitioner's

21   conviction and sentence, but remanded for clarification of the community placement portion of the

22   sentence, in an unpublished opinion. (Dkt #18, Ex. 4). Petitioner petitioned for review with the

REPORT AND RECOMMENDATION
PAGE -3

01 Washington Supreme Court. (*Id.*, Ex. 5). The Washington Supreme Court denied review. (*Id.*,

02 Ex. 6).

03       On November 14, 2003, petitioner filed a personal restraint petition ("PRP") in state court.

04 The Washington Court of Appeals dismissed petitioner's PRP. The Washington Supreme Court

05 granted review, but then dismissed the PRP. (*Id.*, Ex. 13).

06       On November 18, 2005, petitioner filed the instant petition for a writ of habeas corpus

07 under 28 U.S.C. § 2254. (Dkt. #4). After receiving an extension of time, petitioner filed a brief

08 in support of the petition on February 22, 2006. (Dkt. #9). Respondent filed an answer, after

09 receiving an extension of time to do so, along with the state court record, on June 22, 2006. (Dkt.

10 #16). The Court directed respondent to supplement the record on August 1, 2006. (Dkt. #20).

11 Respondent did so on August 10, 2006 (Dkt. #23), and the matter is now ready for review.

12                               <u>GROUNDS FOR RELIEF</u>

13       Petitioner sets forth the following grounds for relief in his habeas petition[1]:

14       1.       I was denied effective assistance of counsel. . . .

15       2.       The trial court was not constitutionally authorized to determine facts that
                  would increase my sentence beyond the prescribed statutory maximum. . .
16
17       3.       The trial court erred in admitting my statements to the police. . . .

18       4.       The trial court erred when engaging in unconstitutional side-bars. . . .

19 (Dkt. #4 at 5-6).

20

21       [1] The Court notes that these issues are presented in a different order in petitioner's brief
   in support of his habeas petition. (Dkt. #9). For the sake of simplicity, the Court will address the
22 issues in the order in which they were presented in the petition.

REPORT AND RECOMMENDATION
PAGE -4

01                                     DISCUSSION

02        Standard of Review

03        Under the Anti-Terrorism and Effective Death Penalty Act, a habeas corpus petition may

04   be granted with respect to any claim adjudicated on the merits in state court only if the state

05   court's adjudication is *contrary to*, or involved an *unreasonable application* of, clearly established

06   federal law, as determined by the Supreme Court.   28 U.S.C. § 2254(d) (emphasis added).

07        Under the "contrary to" clause, a federal habeas court may grant the writ only if the state

08   court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law,

09   or if the state court decides a case differently than the Supreme Court has on a set of materially

10   indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362 (2000).  Under the "unreasonable

11   application" clause, a federal habeas court may grant the writ only if the state court identifies the

12   correct governing legal principle from the Supreme Court's decisions but unreasonably applies that

13   principle to the facts of the prisoner's case.  *Id.*  In addition, a habeas corpus petition may be

14   granted if the state court decision was based on an unreasonable determination of the facts in light

15   of the evidence presented.  *See* 28 U.S.C. § 2254(d)

16        In *Lockyer v. Andrade,* 538 U.S. 63 (2003), the Supreme Court examined the meaning of

17   the phrase "unreasonable application of law" and corrected an earlier interpretation by the Ninth

18   Circuit which had equated the term with the phrase "clear error."  The Court explained:

19              These two standards, however, are not the same. *The gloss of clear error fails to
                give proper deference to state courts by conflating error (even clear error) with*
20              *unreasonableness.  It is not enough that a federal habeas court, in its "independent review
                of the legal question" is left with a "firm conviction" that the state court was "erroneous."*
21              . . . [A] federal habeas court may not issue the writ simply because that court concludes in
                its independent judgment that the relevant state-court decision applied clearly established
22              federal law erroneously or incorrectly.  Rather, that application must be objectively

REPORT AND RECOMMENDATION
PAGE -5

01   unreasonable.

02   538 U.S. at 68-69 (emphasis added; citations omitted).

03        Thus, the Supreme Court has directed lower federal courts reviewing habeas petitions to

04   be extremely deferential to decisions by state courts.  A state court's decision may be overturned

05   only if the application is "objectively unreasonable."  538 U.S. at 69.

06        <u>Petitioner's First Ground for Relief: Ineffective Assistance of Counsel</u>

07        In his first ground for relief, petitioner contends that "[t]here was substantial evidence in

08   the record to show that I was heavily intoxicated.  My attorney, however, failed to raise a

09   diminished capacity defense which could have negated the premeditated element of my charged

10   crime."  (Dkt. #4 at 5).

11        Claims of ineffectiveness of counsel are reviewed according to the standard announced in

12   *Strickland v. Washington*, 466 U.S. 668, 687-90 (1984).  In order to prevail, petitioner must

13   establish two elements: First, he must establish that counsel's performance was deficient, *i.e.*, that

14   it fell below an "objective standard of reasonableness" under "prevailing professional norms."

15   *Strickland*, 466 U.S. at 687-88 (1984).  Second, he must establish that he was prejudiced by

16   counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's

17   unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466

18   U.S. at 694.

19        Regarding the first prong of the *Strickland* test, there is a "strong presumption that

20   counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*,

21   466 U.S. at 689.  Thus, "[j]udicial scrutiny of counsel's performance must be highly deferential."

22   *Id.*  The test is not whether another lawyer, with the benefit of hindsight, would have acted

REPORT AND RECOMMENDATION
PAGE -6

01    differently, but whether "counsel made errors so serious that counsel was not functioning as the

02    'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 689.

03           In addition, the Supreme Court has stated that "a court need not determine whether

04    counsel's performance was deficient before examining the prejudice suffered by the defendant as

05    a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. "The object of an ineffective

06    assistance claim is not to grade counsel's performance. If it is easier to dispose of an ineffective

07    assistance claim on the ground of lack of sufficient prejudice, which we expect will often be so,

08    that course should be followed." *Id.*

09           Petitioner's argument fails for several reasons. First, under *Strickland*, a court reviewing

10    a claim of ineffective assistance of counsel must be highly deferential to counsel's decisions

11    regarding trial strategy. *See* 466 U.S. at 689. Petitioner's counsel's strategic decisions are

12    therefore largely shielded from second-guessing, and to the extent that they can be second-

13    guessed, petitioner has not shown that counsel's decision not to pursue a defense based upon

14    diminished capacity fell outside "the wide range of reasonable professional assistance." *Id.* As

15    the Washington Court of Appeals noted: "Although [petitioner] shared some beer with his friends

16    before committing the crime, the record does not demonstrate that he was not in full control of

17    his faculties. [Petitioner] has not proved that a reasonable defense attorney would have hired an

18    expert to evaluate a diminished capacity defense." (Dkt. #18, Ex. 4 at 11-12).

19           In addition, petitioner fails to show any prejudice that resulted from not pursuing such a

20    defense. Petitioner has not submitted any evidence showing existence of a "mental condition or

21    disorder, and the required nexus between it and the alleged inability to form the requisite specific

22    intent," that would have been required by the trial court to show "diminished capacity" under

REPORT AND RECOMMENDATION
PAGE -7

01  Washington law. *State v. Stumpf*, Wash. App. 522, 526-27 (1992). Although portions of the trial

02  transcript support petitioner's allegation that he was drinking beer on the night of the crime, mere

03  intoxication does not appear to satisfy the requirements under Washington law of a diminished

04  capacity defense. *See id.* Accordingly, the state court decision rejecting this claim is not

05  objectively unreasonable, and petitioner's first claim that counsel was ineffective should be denied.

06          <u>Petitioner's Second Ground for Relief: Challenge to Exceptional Sentence</u>

07          In his second ground for relief, petitioner attempts to challenge the exceptional sentence

08  imposed by the trial court, which was based upon the court's finding that petitioner had displayed

09  "deliberate cruelty" by inflicting over 40 stab wounds with the screw driver to the victim's head

10  and face. (Dkt. #18, Ex. 1, "Findings and Conclusions" at 2). Petitioner's challenge is based upon

11  *Blakely v. Washington* , 124 S. Ct. 2531 (2004), which invalidated a portion of Washington's

12  sentencing scheme as violative of the Sixth Amendment right to trial by jury. However, the Ninth

13  Circuit has held that *Blakely* does not apply retroactively to cases on collateral review. *See*

14  *Schardt v. Payne,* 414 F.3d 1025, 1036 (9th Cir. 2005). Therefore, petitioner may not challenge

15  his conviction based upon an alleged *Blakely* violation, and this claim should be denied.

16          <u>Petitioner's Third Ground for Relief: Statements to Police</u>

17          In his third ground for relief, petitioner contends that the trial court violated his Fifth

18  Amendment right against self-incrimination when it ruled that petitioner's statements to the police

19  were admissible. Respondent counters that petitioner failed to properly exhaust this claim in state

20  court and that the claim is barred from review here.

21          In order to present a claim to a federal court for review in a habeas corpus petition, a

22  petitioner must first have presented that claim to the state court. *See* 28 U.S.C. § 2254(b)(1). The

REPORT AND RECOMMENDATION
PAGE -8

01 exhaustion requirement has long been recognized as "one of the pillars of federal habeas corpus

02 jurisprudence."   *Calderon v. United States Dist. Ct. (Taylor)*, 134 F.3d 981, 984 (9th Cir.)

03 (citations omitted), *cert. denied*, 525 U.S. 920 (1998).  Underlying the exhaustion requirement is

04 the principle that, as a matter of comity, state courts must be afforded "the first opportunity to

05 remedy a constitutional violation." *Sweet v. Cupp*, 640 F.2d 233, 236 (9th Cir. 1981).

06      In addition, a petitioner must not only present the state court with the *first* opportunity to

07 remedy a constitutional violation, but a petitioner must also afford the state courts a         *fair*

08 opportunity.  *Picard v. Connor*, 404 U.S. 270 (1971); *Anderson v. Harless*, 459 U.S. 4 (1982).

09 It is not enough that all the facts necessary to support the federal claim were before the state

10 courts or that a somewhat similar state law claim was made.  *Harless*, 459 U.S. at 6.  "[A] claim

11 for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as

12 well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S.

13 152, 162-63 (1996).

14      Finally, a petitioner must raise in the state court all claims that can be raised there, even

15 if the state court's review of such claims is purely discretionary.  *See O'Sullivan v. Boerkel*, 526

16 U.S. 838, 841-47 (1999).  In other words, a petitioner must invoke one complete round of a

17 state's established appellate review process, including discretionary review in a state court of last

18 resort, before presenting their claims to a federal court in a habeas petition.  *Id.* at 842-44.  Thus,

19 in Washington state, a petitioner must seek discretionary review of a claim by the Washington

20 Supreme Court in order to properly exhaust the claim and later present it in federal court for

21 habeas review.

22      After reviewing the state court record, the court finds that petitioner's Fifth Amendment

REPORT AND RECOMMENDATION
PAGE -9

01    claim was not presented as a federal issue to the Washington Court of Appeals on direct review,

02    nor was the issue presented at all to the Washington Supreme Court.  (Dkt. #18, Exs. 5, 7, 9).

03    Accordingly, petitioner failed to properly exhaust this issue.  In addition, because more than one

04    year has passed since his conviction became final, petitioner is now procedurally barred from

05    raising this claim in state court.  *See* RCW 10.73.090.

06          When, as here, a petitioner has procedurally defaulted on a claim in state court, the

07    petitioner "may excuse the default and obtain federal review of his constitutional claims only by

08    showing cause and prejudice, or by demonstrating that the failure to consider the claims will result

09    in a 'fundamental miscarriage of justice.'"  *See Noltie v. Peterson,* 9 F.3d 802, 806 (9th Cir. 1993)

10    (citing *Coleman v. Thompson,* 501 U.S. 722 (1991)).  Petitioner has failed to show that "cause

11    and prejudice" exist excusing his default on the unexhausted claim.  Nor has he shown that failure

12    to consider the claims will result in a miscarriage of justice.  Accordingly, petitioner's third ground

13    for relief is barred from federal habeas review and should be denied.

14          <u>Petitioner's Fourth Ground for Relief: Use of Side Bar Discussions</u>

15          In his final ground for relief, petitioner maintains that his right to a fair appeal was

16    compromised by the fact that the record on appeal did not include transcripts of the side-bar

17    discussions held between the trial court and the attorneys.  This claim may be summarily denied,

18    however, because petitioner fails to show, or even argue, that he suffered any prejudice by the

19    omission in the record of the side-bar discussions.  Therefore, the state court decision rejecting

20    this claim is not objectively unreasonable, and petitioner's final ground for relief should be denied.[2]

21    _____

22          [2] In his pro se supplemental brief filed in state court, petitioner argued that he suffered
      prejudice from the lack of a record of the side-bar discussions because "there was a conspiracy to

01                                CONCLUSION

02          For the foregoing reasons, petitioner's petition for a writ of habeas corpus should be

03   denied with prejudice.  A proposed Order reflecting this recommendation is attached.

04          DATED this 6th day of October, 2006.

05                                                    _____
06                                                    Mary Alice Theiler
                                                      United States Magistrate Judge

07

08

09

10

11

12

13

14

15

16

17

18

19   _____

20   throw the case to the prosecution, and anytime [sic] the defense got dangerously close to
     developing an issue that may have favored the defense, a side-bar was called, to get their signals
21   and tatics [sic] straight."  (Dkt. #18, Ex. 3 at 19).  However, petitioner does not support this
     allegation with any evidence, nor does he explain how he knows that the side-bar discussions were
22   used for this improper purpose.

REPORT AND RECOMMENDATION
PAGE -11